**BLUE RIDGE BANK AND TRUST COMPANY, et al., Appellants–Respondents,**

v.

**AMERICAN ASSOCIATION OF ORTHODONTISTS FOUNDATION, et al., Respondents–Appellants.**

Nos. WD 60637, WD 60664, WD 60753.

Missouri Court of Appeals, Western District.

May 6, 2003.

Martin M. Meyers, Linda Hart Tabory, Kansas City, MO, for Appellants–Respondents Blue Ridge Bank and Trust Co. and Kathleen Osborn.

Steven E. Mauer, Jennifer A. Donnelli, Kansas City, MO, for Respondent–Appellant American Association of Orthodontists Foundation.

Dennis D. Palmer, Christine M. Graham, Kansas City, MO, for Respondent–Appellant UMB Bank, N.A.

Lawrence P. Katzenstein, Michael W. Bartolacci, St. Louis, MO, for Respondents–Appellants Missouri Botanical Gar-

den Board of Trustees, St. Louis Zoo Friends Association, Circle of Concern, Inc., The Salvation Army, Missouri Historical Society and St. Louis Science Center Foundation.

Before BRECKENRIDGE, P.J., HOWARD and HOLLIGER, JJ.

VICTOR C. HOWARD, Judge.

This is a consolidated appeal from a summary judgment granted by the Probate Division of the Circuit Court of Jackson County, Missouri, on a suit for declaratory judgment seeking instructions concerning the proper allocation and distribution of trust assets.

The probate court construed the provisions of the subject trust to require the funding of both "Share A" and "Share B" set forth therein. Certain of the defendants contend on appeal that the probate court erred in construing the trust to require the funding of Share B. Plaintiffs cross-appeal the portion of the court's judgment concerning how and to what extent Share B is to be funded.

Upon *de novo* review, we find that the terms of the subject trust provision concerning the tax-dependent circumstances under which Share B is to be funded are unambiguous. The funding of Share B will result in additional taxes owing with respect to Grantor's estate; this contravenes the Grantor's intent. Accordingly, we reverse the judgment.

## Background

On February 1, 1999, Jane Bedell executed the "Jane L. Kirkland Bedell Revocable Trust Agreement" (Jane's Trust), the relevant terms of which are set forth below. This trust provides that at the time of her death, her net distributable estate is to be divided into one or two shares ("Share A" and/or "Share B"), depending upon certain tax-dependent circumstances. If both shares are funded, twelve named charities will receive as beneficiaries of Share A, while four non-charitable, individual beneficiaries will receive as income beneficiaries of the trust established in Share B. Upon the death of all Share B beneficiaries, the remaining trust principal of Share B will be distributed to the charity beneficiaries named in Share A.

Jane passed away three months later, on April 9, 1999, at which time her trust held assets of $2,349,884. However, her total taxable estate was $3,198,631 because it included over $800,000 allocated to a Marital Trust set aside for her by the terms of her deceased husband Robert's revocable trust, which was executed in 1995. Even though Jane did not exercise her right to withdraw these funds during her lifetime, and her estate never actually received these assets, they are considered her property because she was given a general power of appointment over the funds.[1]

According to the terms of Jane's trust, her cousin Kathleen S. Osborn and Com-

---

**1.** According to the undisputed facts, Jane was married to Robert Bedell from 1984 until his death on May 15, 1996. Pursuant to Robert's Revocable Trust Agreement, upon his death, eighty-five percent of Robert's trust assets were placed in a Marital Trust for Jane's benefit during her lifetime. The remaining fifteen percent was divided between Robert's son and grandson. For federal estate tax purposes, Jane had a general power of appointment over the Marital Trust assets during her lifetime. *See* 26 U.S.C. § 2056(b)(5)

(1994). Because of this general power of appointment, Jane's share of the Marital Trust property was included in Jane's gross estate at her death. 26 U.S.C. § 2041 (1994). In effect, this estate-planning tool allows for deferment of estate taxes until the second spouse dies. When Jane died, Robert's trust provided that the trustee was to pay the taxes due because of the inclusion of the Marital Trust's assets in Jane's estate and distribute any remaining assets to his son and grandson.

merce Bank served as co-trustees. Pursuant to its trustee powers, Commerce filed the required estate tax return (Form 709), in which it applied all of the trust assets to Share A, which distribution, being of a charitable and thus deductible nature, incurred no tax liability. Commerce then used Jane's $211,300 "unified credit against estate tax," *see* 26 U.S.C. § 2010(c) (Supp.1999),[2] to offset $277,468 of Jane's estate taxes due because the aforementioned Marital Trust assets were included in her estate for tax purposes. The trustee for Robert's trust paid the remaining tax of $66,168, because Robert's trust provided that it was to pay any excess estate taxes owed because of the inclusion of the Marital Trust assets in Jane's taxable estate.

Commerce determined that the terms of Jane's trust and the circumstances at her death precluded funding Share B, because such funding would increase the taxes due with respect to Jane's estate, which Jane's trust's funding provision for Share B expressly forbid. Kathleen Osborn, as co-trustee,[3] disagreed with Commerce's interpretation of the trust, so she removed Commerce as the corporate co-trustee and appointed Blue Ridge Bank as the successor corporate co-trustee.

Blue Ridge Bank and Trust Company and Kathleen Osborn (Plaintiffs) then filed this declaratory judgment action seeking interpretation of Jane's trust and a declaration of the rights and duties of the plaintiffs and defendants under her trust. Plaintiffs sought a determination of whether the terms of Jane's trust require that her applicable exclusion amount ($650,000) be utilized to fund Share B rather than it being used to reduce the overall estate taxes against Jane's estate as Commerce did. Specifically, Plaintiffs propose funding Share B by shifting $650,000 from the deductible Share A, then using the applicable exclusion amount to shield the Share B taxable distributions from taxes. This, however, would result in additional taxes of over $275,000 being levied against Jane's estate, which Plaintiffs claim should be paid by transferring that amount from the Marital Trust assets.

The named defendants in the action are the twelve charities named as beneficiaries of Share A, the four named individual beneficiaries of Share B (Share B beneficiaries), and United Missouri Bank (UMB)[4] as trustee of Jane's deceased husband Robert's revocable trust, which included a Marital Trust for Jane's benefit. UMB is a party because, as previously mentioned, the terms of Robert's trust dictate that it is responsible for the payment of taxes generated as a result of the inclusion of the Marital Trust assets in Jane's gross estate by reason of her general power of appointment over those assets.

The various parties filed their respective answers, and five of the twelve charitable defendants (the Charities) filed a counter-

---

**2.** The parties do not dispute the $211,300 "unified credit" figure arrived at by Commerce after applying to Jane's assets what the parties and probate court commonly refer to as the $650,000 federal estate tax "exemption equivalent amount" or "applicable exclusion amount." However it is referred to, the $650,000 figure represents the maximum amount of taxable gifts and bequests Jane could make to non-charitable beneficiaries that would not be subject to estate tax under 26 U.S.C. § 2010(c) (Supp.1999). At the time

of her death in 1999, the entire $650,000 remained to shelter estate assets from tax.

**3.** Kathleen Osborn is also a named income beneficiary of Share B.

**4.** Technically speaking, the record indicates that UMB became the successor to UMB Bank of St. Louis, N.A., in September of 1999 and assumed duties as trustee of Robert's revocable trust.

claim/cross-claim against Plaintiffs, the remaining charitable defendants and the four individual defendants. In April of 2001, Plaintiffs moved for summary judgment under Rule 74.04.[5] The Charities filed cross-motions for summary judgment. The parties then submitted the case to the probate court on the cross-motions for summary judgment based on stipulated facts.

The probate court held that the interpretation of Jane's trust necessitated the funding of Share B with Jane's $650,000 applicable exclusion amount, which amount, as explained above, Commerce had previously applied to offset taxes due as a result of the inclusion of more than $800,000 of Marital Trust assets in Jane's taxable estate. In its amended judgment, the court: (1) overruled the Charities' Cross–Motion for summary judgment; (2) granted Plaintiffs' Motion for Summary Judgment and entered judgment in favor of Plaintiffs and against the Charities and UMB as trustee of Robert's trust; (3) entered judgment in favor of Plaintiffs and against the Charities on their counterclaim and against cross-claim plaintiffs and in favor of cross-claim defendants on said defendants' cross-claim; (4) directed UMB as trustee of Robert's trust to transfer assets and/or funds of a value of $275,564 to Plaintiffs as co-trustees of Jane's trust; (5) directed Plaintiffs, as co-trustees of Jane's trust, to fund Share B with said $275,564; and (6) overruled UMB's motion to amend judgment or in the alternative for a new trial. Plaintiffs also filed a motion nunc pro tunc to clarify the judgment, but the probate court did not further amend the judgment.

After the probate court entered its amended judgment, the parties filed cross-appeals. We consolidated the appeals. The Charities and UMB contend that the probate court erred in interpreting Jane's trust to require the funding of Share B. The Plaintiffs seek clarification of how and to what extent they are to fund Share B. The parties do not dispute that, if the probate court's judgment is correct in ordering the funding of Share B, the court nonetheless erred in its directive for how and to what degree Share B is to be funded, as set forth above in "(5)" of the probate court's holding.

### Standard of Review

Summary judgment is appropriately granted when the movant shows that there is no genuine dispute of material fact and that movant is entitled to judgment as a matter of law. Rule 74.04(c)(3); *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 380 (Mo. banc 1993). As explained by the Missouri Supreme Court:

> [Appellate] review is essentially *de novo*. The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the [probate] court to determine the propriety of sustaining the motion initially. The propriety of summary judgment is purely an issue of law. As the [probate] court's judgment is founded on the record submitted and the law, an appellate court need not defer to the [probate] court's order granting summary judgment.

*Id.* at 376 (citations omitted).

As previously mentioned, this matter comes before us as a result of cross-motions for summary judgment. The parties acknowledge that there is no dispute as to

---

**5.** Missouri Rule of Civil Procedure (2001). This rule governing summary judgment has been amended effective January 1, 2003.

the material facts of the case and that summary disposition of the case is appropriate. In reviewing the record, we consider it in the light most favorable to the party against whom judgment was entered, and facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the nonmoving party's response to the summary judgment motion. *Id.*

### Jane's Trust

The various issues before us on appeal concern the interpretation of Article "THIRD"—the funding provision—of Jane's trust. As noted above, Jane provided for her estate to be divided into a Share A and a Share B.

Regarding Share A, she provided in relevant part as follows:

*Section (I)* A. The first share (herein sometimes referred to as "Share A"), for the benefit of certain charitable institutions hereinafter designated and identified, shall be paid over and delivered to them as their absolute property. The amount of Share A shall be that amount for which a charitable deduction is allowable under the federal estate tax laws in effect at the Grantor's death; that is to say, this share shall be equal to the amount of the maximum charitable deduction allowable to the Grantor's estate for federal estate tax purposes. *Such bequest shall, however, be reduced by the maximum amount, if any, which would not result in: (i) any increase in the federal tax due with respect to the Grantor's estate;* or (ii) any increase in the amount of the allowable credit under Section 2011 of the Federal Internal Revenue Code[, which, by its title, governs "Credit for State death taxes"] . . . . It is the Grantor's intention that the bequest under and pursuant to this Section, qualifying for said charitable de-

duction, shall be made only to the extent that making such bequest would cause a reduction in the taxes payable under Subtitle B of the Federal Internal Revenue Code as the result of the Grantor's death, without incurring an offsetting increase in state death taxes so payable.

(Emphasis added.) Jane provided for Share B in relevant part as follows:

*Section (II)* The second share (herein sometimes referred to as "Share B"), for the benefit of the individual beneficiaries hereinafter designated, *shall consist of so much of the trust estate as is not included in Share A* [, as emphasized above in Section (I) ].

(Emphasis added.)

In summary, Jane's trust provides that Share A is to be funded by the maximum amount allowable for charitable deductions at the time of her death, less the amount that will not increase the federal estate tax owed with respect to her estate, which amount, if any, will be used to fund Share B. When the last surviving beneficiary of Share B dies, any remainder of Share B will go to the Charities named in Share A.

### Jane's Intent

The above-emphasized portions of Jane's trust are those which have led to the issue now before us. The parties do not dispute that Jane had available the $650,000 applicable exclusion amount under 26 U.S.C. § 2010(c) (Supp.1999). Rather, they dispute how to apply her applicable exclusion amount, i.e., Jane's intent with regard to funding Share B.

Although there are many subarguments, the following is a synopsis of the parties' primary arguments:

*Plaintiffs' Arguments:* Plaintiffs argue, and the probate court agreed, that Jane did not intend for her 26 U.S.C. § 2010(c) applicable exclusion amount to be used to

offset the tax liability due by reason of the inclusion of the Marital Trust assets in her taxable estate, because she knew that Robert's trust provided that it would be responsible for the taxes generated in that regard. In essence, they claim that the "taxes due with respect to" her estate phrase (appearing where she describes Share A) does not include that portion of taxes that Robert's trustee was responsible for. Thus, Plaintiffs argue that Jane intended the $650,000 applicable exclusion amount as a possible fund source for Share B, and, therefore, she intended that any portion of her $650,000 applicable exclusion available at the time of her death be used specifically for that purpose, rather than allowing use of the applicable exclusion amount to offset the taxes to be paid by Robert's trustee. They argue, and the probate court found, that Commerce, as Jane's original corporate co-trustee, should have collected the full amount of taxes due from Robert's trustee by reason of the inclusion of the Marital Trust's assets in Jane's gross estate and used the $650,000 applicable exclusion amount to fund Share B. In support of their argument, they contend that the "tax clause" of Jane's trust authorizes the trustee to pay taxes due only with regard to her trust or probate estate, of which there would be none if Share B is funded with her applicable exclusion amount. In summary, Plaintiffs argue:

> In the simplest possible terms, it defies reason to conclude that Jane wanted the recipients of property other than the property in her probate and trust estates to have the benefit of her unified tax credit notwithstanding her clear directive that her trustees were not authorized to pay the taxes due based on the inclusion of such assets in her taxable estate. The more reasonable interpretation is the one adopted by [the probate court]—that Jane wanted her beneficia-

ries to have the benefit of her unified credit provided it would not result in *her* trust having to pay any taxes as a result. (Emphasis added.)

*Defendants' Arguments:* The Charities and UMB, on the other hand, argue that when reading Jane's trust in its entirety, her clear and unambiguous intention was to avoid any taxes due *"with respect to"* her estate, regardless of who was ultimately responsible for paying such taxes. They argue that, despite Plaintiffs' contentions to the contrary, Jane did not explicitly direct that Share B be funded with the $650,000 applicable exclusion amount available at her death. Because funding Share B with the applicable exclusion amount results in additional taxes due *with respect to her estate* by reason of the inclusion of the Marital Trust assets in her estate, even if Robert's trustee could be ultimately responsible for such taxes under the terms of Robert's trust, such funding violates Jane's clear directive that Share B should not be funded if doing so increases the taxes due "with respect to" her estate. They maintain that the funding provision of Jane's trust is unambiguous, so we cannot resort to extrinsic evidence, i.e., Robert's trust, to determine Jane's intent.

### Interpreting the Trust

■ In general, Missouri courts construe wills and trusts using the same rules of construction while always keeping in mind that "[t]he paramount rule of construction in determining the meaning of a trust provision [to which all technical rules must give way], is that the intent of the grantor is controlling." *A.G. Edwards Trust Co. v. Miller,* 59 S.W.3d 550, 552 (Mo.App. E.D.2001). In determining Jane's intent with regard to the provision relating to the funding of Share B, our goal is to "give meaning to [her] entire trust instrument, avoiding repugnancies, if

possible, and to adopt a construction which reconciles rather than creates inconsistencies." *Id.* We presume that Jane knew and intended the legal effect of the language used. *Id.* Thus, unless her trust agreement sets forth a contrary meaning, we consider each word used in light of its "usual, ordinary and natural meaning," and we will not grant undue preference to a single clause or word. *Id.* Nor will we "turn to the rules of construction where there is no ambiguity as to [Jane's] intent nor attempt to rewrite [her trust] in the guise of construction." *Mercantile Trust Co., N.A. v. Hardie,* 39 S.W.3d 907, 910 (Mo.App. S.D.2001).

In holding as it did, the probate court relied, in large part, upon the fact that Robert's trust provided that his trustee would be responsible for any taxes generated by reason of the inclusion of the Marital Trust's assets in Jane's taxable estate. Specifically, the probate court considered the terms of Robert's trust and concluded that "Commerce Bank, in applying the unified credit exemption as it did, ignored the provision of Robert's trust which required that trust to bear the burden of the payment of the federal estate tax generated by the inclusion of the Marital Trust assets in Jane's estate."[6] Although it did not explicitly hold that Jane's trust was ambiguous, such finding was required to resort to extrinsic evidence (Robert's trust provisions) in interpreting Jane's trust. This is because:

"[A]bsent ambiguity the intent of the maker of a legal instrument is to be ascertained from the four corners of the instrument without resort to extrinsic evidence...." A document is not ambiguous merely because the parties disagree over its meaning. Extrinsic and

parol evidence cannot be used to create an ambiguity.

*Blackburn v. Habitat Dev. Co.,* 57 S.W.3d 378, 386 (Mo.App. S.D.2001) (quoting *Commerce Trust Co. v. Duden,* 523 S.W.2d 97, 99 (Mo.App.1975)) (other citations omitted).

Thus, the issue before us turns in large part upon whether or not Jane's trust is ambiguous, which is a question of law. *Feinberg v. Adolph K. Feinberg Hotel Trust,* 922 S.W.2d 21, 24 (Mo.App. E.D. 1996). Again, a trust agreement is not ambiguous merely because the parties differ as to its interpretation. *Boatmen's Trust Co. v. Sugden,* 827 S.W.2d 249, 254 (Mo.App. E.D.1992). Without finding an ambiguity, this court cannot look outside the four corners of Jane's trust to determine her intent, so we cannot consider the provisions in Robert's trust in determining Jane's intent. *Commerce Trust Co. v. Starling,* 393 S.W.2d 489, 494 (Mo.1965).

In *Schupbach v. Schupbach,* 760 S.W.2d 918, 923 (Mo.App. S.D.1988) (citations omitted), the Southern District aptly explains the process for determining whether extrinsic evidence may be introduced to aid in the interpretation of a trust because of an ambiguity:

" '[A]mbiguity' means 'duplicity, indistinctness or uncertainty of meaning of an expression used in a written instrument.' " An ambiguity in a ... trust may be either patent or latent. A patent ambiguity occurs when the duplicity, indistinctness, or uncertainty of meaning appears on the face of the instrument being considered, which, in this case, would be on the face of ... the trust agreement. A latent ambiguity occurs when the instrument being considered is

---

**6.** As previously mentioned Robert's trustee did in fact pay $66,138 in taxes due by such inclusion.

unambiguous on its face but becomes open to more than one interpretation when applied to the factual situation in issue. . . .

Plaintiffs argue, and the probate court apparently agreed, that the portion of Jane's trust providing that Share B will be funded out of Share A "by the maximum amount, if any, which would not result in: (i) any increase in the federal tax due with respect to the *Grantor's estate*" is ambiguous in that it is not clear if she means "Grantor's [taxable] estate," "Grantor's [probate] estate," or "Grantor's [trust estate]." They contend that because Jane is presumed to have known that *Robert's* trustee would pay the taxes due with regard to the inclusion of the Marital Trust assets in her taxable estate, what she intended by this section was to fund Share B if doing so would not increase the taxes due with respect to *her probate* or *trust* estates. As previously mentioned, Plaintiffs claim that a portion of the "tax clause" in Jane's trust clearly supports such a finding. This "tax clause," in Article "SECOND," Section B, provides in relevant part:

> Upon the death of the Grantor, the Trustee shall pay any and all taxes owing by the Grantor at the Grantor's death, including, but not limited to, federal and state income, gift and property taxes . . . and a proportionate part of all taxes lawfully imposed by reason of Grantor's death . . ., including federal estate taxes, state estate and inheritance taxes, federal, state, and foreign country transfer and succession duties . . . predicated upon the death of the Grantor as the taxable event, *and based upon the inclusion of assets of this trust estate and the Grantor's probate estate in the Grantor's taxable estate,* out of the assets of the trust estate remaining after payment of all gifts, bequests and devises which are deductible for tax purposes and the payment of all gifts, bequests and devises of a specific sum of money or of specific property. No portion of the taxes payable hereunder shall be charged against, or reduce any gift, bequest or devise which is deductible for tax purposes. In the event that the trust estate shall include any United States Government Bonds which are redeemable at par in payment of estate taxes, such bonds shall be used first in payment of such taxes (including taxes imposed by reason of assets other than assets of the trust estate).

(Emphasis added.)

Contrary to Plaintiffs' argument that the emphasized portions of this tax clause dictate that Jane's trustee cannot pay any taxes unless due by reason of assets in her *probate* and *trust estates,* the probate court correctly acknowledged that Jane's trust clearly authorizes her personal representative and/or trustee, "in the first instance," to pay "any and all" federal estate taxes "owing" on Jane's estate, "including but not limited to" those parts highlighted by Plaintiffs as emphasized above. However, the probate court went one step further by considering and interpreting Robert's trust to find that the increased tax burden due as a result of funding Share B with Jane's applicable exclusion amount would not be due "with respect to" her estate.

Because, as more fully explained below, we find no ambiguity in Jane's trust, we cannot look past the "first instance" reading of Jane's "tax clause" requiring her trustee to pay "any and all taxes owing" at her death. Within the four corners of Jane's trust agreement, she unambiguously did not intend to fund Share B unless no further taxes would be imposed on her taxable estate—period.

Plaintiffs seem to rely in large part on *Robert's* intent in setting up his trust to discern *Jane's* intent in drafting her trust more than three years after his death. But, this is not a case of Robert's and Jane's trust agreements forming a part of the same estate plan, which would require that they be construed together. *See Commerce Trust Co.*, 393 S.W.2d at 494 (construing a will and trust agreement together because they did form a part of the same estate plan); *see also Schupbach*, 760 S.W.2d at 924 (Maus, J., concurring) (construing provisions of a will and a trust that were a part of the same estate plan together). Rather, resort to Robert's trust's provisions may only be had after finding Jane's trust ambiguous.

■ Once again, we find no ambiguity in Jane's trust provision providing that the bequest to "Share A" is to be reduced by [and used to fund Share B with] the maximum amount, *if any*, which would not result in … *any increase* in the federal tax due *with respect to [Jane's] estate.*" (Emphasis added.) The entire clause refers to and discusses Jane's taxable estate for federal estate tax purposes. The term "estate" logically refers to *taxable* estate because that is the estate upon which federal taxes are calculated. In both this section and throughout her trust, Jane is concerned first and foremost with minimizing taxes. Her estate planning objectives were clearly to incur the least amount in estate taxes possible. In light of this, we perceive no " 'duplicity, indistinctness or uncertainty of meaning of' " the expression "Grantor's estate" used in the Article THIRD funding provision. *Schupbach*, 760 S.W.2d at 923. Jane unambiguously intended the funding of Share B to be contingent upon the resulting tax effect on her *taxable* estate. If we adopt the position of the Plaintiffs and probate court, funding Share B with Jane's $650,000 ap-

plicable exclusion amount *will* result in an increase in the federal tax due with respect to Jane's taxable estate in excess of $275,000, a result expressly forbidden by Jane.

In further support of their argument, Plaintiffs attempt to establish the existence of a "separate property arrangement" between Robert and Jane to show that his trust was paying taxes on *his* property and that Jane knew this and intended not to allow the applicable exclusion amount to offset the taxes due on *his* property. The probate court agreed. However, we find this argument concerning a supposed "separate property arrangement" between Robert and Jane is a stretch that is not aptly supported by evidence in the record; even if it were supported, such a conclusion could not be made without resorting to extrinsic evidence, which we cannot do without finding an ambiguity in Jane's trust.

Plaintiffs also argue, and the probate court agreed, that because Jane did not use her tax credit during her lifetime and she included extensive provisions in her trust with regard to the operation of the trust to be established for the Share B individual beneficiaries if Share B is funded, i.e., the direction that the trustee could invade the trust's principal to guarantee the beneficiaries receive their proportionate share of income of not less than five percent of the aggregate principal annually, she "clear[ly]" intended to benefit the Share B beneficiaries. We disagree. Estate plans often include elaborate details for contingencies that may or may not arise upon the death of the grantor or testator, in an effort to provide for the many unpredictable or unforeseeable contingencies that can occur in the future. But, the provisions are just that—contingencies. There was not and is not any mandate that Share B of Jane's trust be funded. Rather, the trust unambiguously

provides that Share B was to be funded with that amount, "*if any*," which could be taken from Share A without increasing the amount of taxes owed with respect to Jane's estate.

Jane's general scheme or intent, as shown by her entire trust agreement, was to distribute her assets in a way that resulted in the smallest tax burden to her estate, not necessarily to be sure that particular individuals received particular property. It is clear she first wanted to minimize or avoid taxes and benefit the twelve charities in Share A and, after that, potentially provide an income interest to those named in Share B. She did not intend to fund Share B unless she could do so without incurring *any* additional tax liability *with respect to her estate*.

This is not to say that Share B could never have been funded. Had Jane lived longer, her applicable exclusion amount could have been greater than the amount of the Marital Trust's assets included in her estate, thereby resulting in a remainder of the applicable exclusion amount of assets being available to fund Share B. For example: 26 U.S.C. § 2010(c) (Supp.1999) provided at the time Jane drafted her revocable trust agreement in 1999 that for estates of decedents dying in 2006 or thereafter, the applicable exclusion amount would be $1,000,000.[7] If Jane had died during one of these years, and, for argument purposes, the value of the assets of the Marital Trust included in Jane's estate by reason of her general power of appointment was $850,000, then $850,000 of Jane's applicable exclusion amount would be applied to offset those assets, so no taxes would be due and owing on them. The remaining $150,000 of the applicable exclusion amount would still be available to fund Share B, without resulting in any addition-al taxes being due with respect to Jane's estate. Simply because she died before the applicable exclusion amount exceeded the amount of assets in the Marital Trust does not mean that Jane intended to use the credit to fund Share B rather than offset the taxes due with respect to her estate, which included the Marital Trust assets.

We have considered the remaining arguments advanced by Plaintiffs in support of a finding that Jane intended to use any applicable exclusion amount available at her death to fund Share B. We are not persuaded, and, by reason of our discussion above, do not feel that each requires addressing.

Because we hold that Share B is not to be funded, the issues in Plaintiffs' cross-appeal concerning alleged errors in the probate court's judgment related to the technicalities of such funding are moot.

### Conclusion

Upon our *de novo* review of Jane's trust provision concerning the contingent funding of Share B, we find that she clearly and unambiguously intended to fund Share B if, and only if, doing so would not increase the taxes due with respect to her taxable estate. Because funding Share B with her unified credit applicable exclusion amount of $650,000 will result in additional taxes being due with respect to her estate, such funding cannot take place. Therefore, we reverse the probate court's judgment.

BRECKENRIDGE, P.J., and HOLLIGER, J., concur.

---

7.  26 U.S.C. § 2010(c) was amended in 1997 to add the applicable exclusion amounts referred to herein that were in effect in 1999 when Jane drafted her trust agreement. It has since been amended in 2001 to reflect higher applicable exclusion amounts.